TODD BLANCHE
Deputy Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
ALEXANDER B. SCHWAB
Assistant United States Attorney
Acting Chief, Criminal Division
CHELSEA NORELL (Cal. Bar No. 280831)
Assistant United States Attorney
Major Crimes Section
1300 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
Telephone: (213) 894-2624
Facsimile: (213) 894-0141
E-mail: Chelsea.norell@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MATEO PAUL,<br>aka "Infant Bix,"<br><br>Defendant. | No. CR 23-116(A)-FLA<br><br><u>GOVERNMENT'S SENTENCING MEMORANDUM FOR DEFENDANT MATEO PAUL; NORELL DECLARATION AND EXHIBITS A THROUGH O FILED CONCURRENTLY HEREWITH</u><br><br>Hearing Date: February 6, 2026<br>Hearing Time: 11:00 a.m.<br>Location: Courtroom of the Hon. Aenlle-Rocha |

Plaintiff United States of America, by and through its counsel of record, the First Assistant United States Attorney for the Central District of California and Assistant United States Attorney Chelsea Norell, hereby files its Sentencing Position.

This Sentencing Position is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: January 23, 2026

Respectfully submitted,

TODD BLANCHE
Deputy Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney

ALEXANDER B. SCHWAB
Assistant United States Attorney
Acting Chief, Criminal Division

/s/
CHELSEA NORELL
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**TABLE OF CONTENTS**


DESCRIPTION PAGE

MEMORANDUM OF POINTS AND AUTHORITIES....................................1

I. INTRODUCTION.......................................................1

II. DEFENDANT DEVISED A PLAN TO ROB THE VICTIMS AT GUNPOINT, LEAVING ONE VICTIM DEAD AND THE SECOND SERIOUSLY WOUNDED.......2

III. GUIDELINES CALCULATION............................................5

IV. THE SENTENCING FACTORS SUPPORT A 30-YEAR SENTENCE..............6

A. The Seriousness of the Offense Warrants a 30-Year Sentence...........................................................6

B. A 30-Year Sentence Is Necessary to Protect the Public and to Deter Defendant's Further Crimes...................8

C. Defendant's Favorable Plea Accounts for Mitigation and His Acceptance of Responsibility and No Further Downward Variance Is Warranted...........................10

V. DEFENDANT SHOULD BE ORDERED TO PAY RESTITUTION................11

VI. CONCLUSION........................................................11

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Defendant Mateo Paul devised a plan to rob a victim at gunpoint so he could gain some marijuana and money. He selected the victim, gave the victim's contact information to co-conspirator Iysis Smith, and instructed Smith to lure the victim to a pre-planned meeting spot. At the meeting spot, defendant, driving, and co-conspirator Leandrew Raglin in the passenger seat, ambushed the victim and his passenger, a second victim. Raglin got out of the car and shot the second victim four to five times before running to the other side of the car and shooting the victim four times, both at point blank range. The victims didn't put up a fight; they were unarmed; they said the robbers could "take the weed!" After the victims were shot, defendant and Raglin left them to die. The second victim, J.B., miraculously survived. Victim A.B., a 26-year-old father to a then-three-year-old son, wasn't as lucky. After he was shot point blank in the chest, he drove his car into a nearby cemetery gate and succumbed to his injuries that night, March 15, 2021.

In September 2023, defendant and co-conspirators Raglin and Smith were charged with conspiracy to interfere with commerce by robbery (count one); interference with commerce by robbery (count two); and brandishing and discharging a firearm in furtherance of a crime of violence, resulting in death (count three). (Dkt. 58.) Defendant pleaded guilty to counts two and three on February 18, 2025. (Dkt. 190.)

Consistent with the plea agreement, the United States Probation Office ("USPO") calculated a total offense level of 40, and determined that defendant falls within Criminal History Category II,

resulting in an advisory Guidelines range of 324-405 months on count two that is capped by the statutory maximum sentence of 240 months, followed by a ten-year mandatory minimum sentence on count three. The government does not object to the facts or computations in the PSR.

As set forth below, defendant should be sentenced to 30 years' imprisonment, consisting of 20 years on count two and 10 years on count three; three years of supervised release on count two and five years of supervised release on count three, to be served concurrently; and an order requiring defendant to pay a special assessment of $200 and mandatory restitution in the amount of $1,959,675.87, for which he is jointly and severally liable with his co-conspirators.

## II. DEFENDANT DEVISED A PLAN TO ROB THE VICTIMS AT GUNPOINT, LEAVING ONE VICTIM DEAD AND THE SECOND SERIOUSLY WOUNDED

On March 15, 2021, defendant and co-conspirators Leandrew Raglin and Iysis Smith met at a friend's house in Inglewood, California. (Dkt. 167 at 9.) They devised a plan to rob at gunpoint a victim who defendant knew sold marijuana. (Id.; PSR ¶¶ 14, 16.) Defendant directed Smith to reach out to the victim, pretending that she wanted to buy marijuana and telling him to meet her at a location near the Inglewood house, at which point defendant and Raglin would ambush and rob him. (Dkt. 167 at 9; PSR ¶ 18; Norell Decl., Ex. M[1] [8/28/25 Trial Tr.] at 481 ("Infant came up with the idea that we could rob somebody" and "he suggested that I text someone off Instagram and ask for a pound of weed"); Ex. N [8/29/25 Trial Tr.] at 739-741

[1] Unless otherwise noted, all exhibit citations refer to the exhibits attached to the Declaration of Chelsea Norell.

(explaining that Paul, aka "Infant," asked Smith to message someone on Instagram to set them up to be robbed).)

Defendant Paul specifically contemplated using a gun in the robbery. He told both his co-conspirators that they would "scare" the victim with the gun (Ex. M [8/28/25 Trial Tr.] at 481), but he privately told co-conspirator Raglin that they would "use" the gun on the victim if things went "left," meaning they'd shoot the victim if necessary to successfully complete the robbery (Ex. N [8/29/25 Trial Tr.] at 746-747). Defendant was armed with a gun at the time he devised this plan. (Ex. M [8/28/25 Trial Tr.] at 507; Ex. N [8/29/25 Trial Tr.] at 748.)

Smith messaged Victim A.B. and told him to meet her at an address close to the Inglewood house to sell marijuana to her. (Dkt. 167 at 9.) Victim A.B. arrived at the meeting location with a second person, Victim J.B. (Id.) Smith approached the victims' car, pretending to be interested in buying marijuana. (Id.) While she distracted the victims, defendant drove up behind the victims' car and stopped while Raglin jumped out of the car, ran up to the passenger side of the car, pointed a gun at the passenger, and demanded the victims' marijuana. (Id.; Ex. M [8/28/25 Trial Tr.] at 516; PSR ¶ 21.) Victim A.B. shouted, "You can take the weed!" (Ex. M [8/28/25 Trial Tr.] at 516; Ex. L [8/27/25 Trial Tr.] at 401.) Nevertheless, Raglin shot Victim J.B. approximately five times, then ran to the other side and shot Victim A.B. approximately five times – each at point blank range – killing A.B. and grievously wounding Victim J.B., before stealing the marijuana. (Dkt. 167 at 9; Ex. M [8/28/25 Trial Tr.] at 515.)

Defendant sped away in the getaway car, leaving the victims for dead. (Ex. M [8/28/25 Trial Tr.] at 517; PSR ¶ 22.) Raglin and Smith fled on foot, running in opposite directions. (Ex. M [8/28/25 Trial Tr.] at 516-517.) Meanwhile, Victim A.B., in his last act, tried to get himself and Victim J.B. to safety, driving down the street where he crashed into a cemetery gate. (Ex. L [8/27/25 Trial Tr.] at 396; PSR ¶ 23.) When paramedics arrived, Victim A.B. was breathing very shallowly. (Ex. L [8/27/25 Trial Tr.] at 311.) He succumbed to his gunshot wounds. (Ex. L [8/27/25 Trial Tr.] at 314; PSR ¶ 23.) Victim J.B. narrowly escaped the same fate, miraculously surviving multiple gunshot wounds to the head after undergoing brain surgery. (Ex. L [8/27/25 Trial Tr.] at 403; PSR ¶ 23.)

After he fled, Raglin didn't return to the Inglewood house until the next morning, where defendant and Smith were still hiding out from law enforcement. When Raglin returned, defendant discussed the crime with him in a conversation Smith overheard. (Ex. M [8/28/25 Trial Tr.] at 538-539.) Defendant, a Pirus Bloods gang member with the moniker "Infant Bix," (PSR ¶ 14) told Raglin, an aspiring gangster, that Raglin could "tell the homies what [he] did" and then he "[could] be from the hood," meaning that Raglin had earned his spot in the Pirus Bloods gang by shooting Victim J.B. and shooting and killing Victim A.B. (Ex. M [8/28/25 Trial Tr.] at 538-539). Then, about two weeks later, defendant posted an Instagram Story seemingly about the robbery-homicide and Raglin's initiation into the Pirus Bloods. (Trial Ex. 31.) In the Story, defendant pointed the camera at Raglin and said, "That's a real shooter in the back. On Philly, TreeTop Pirus 400 Spruce, that's the shooter." (Id.) As explained at trial, "On Philly" is comparable to saying "On Blood,"

or "I swear to god," because the Pirus Bloods have adopted the insignia of the Philadelphia Phillies major league baseball team, as the color is red (like blood) and the logo is a "P" (like Pirus). (Ex. N [8/29/25 Trial Tr.] at 856-857; Ex. O [9/2/25 Trial Tr.] at 965-966.) Far from showing any remorse, defendant celebrated his crime and encouraged Raglin to exploit it to gain entry into defendant's gang.

**III. GUIDELINES CALCULATION**

As set forth in the plea agreement and the PSR, the government submits that the base offense level for count two is 43 because Victim A.B. was killed during defendant's commission of the robbery. (PSR ¶¶ 38-41; Dkt. 167 at 10; U.S.S.G. §§ 2A1.1(a) and 2B3.1(c)(1).) Consistent with the plea agreement, the government agrees that no specific offense characteristics enhancements apply. Defendant should receive a three-level reduction for acceptance of responsibility, resulting in a total offense level of 40. (PSR ¶¶ 55-56, 58.) The Guidelines sentence for count three is the mandatory minimum sentence of 10 years' imprisonment, consecutive to the sentence on count two. (PSR ¶ 59.)

The government agrees with the PSR that defendant is in Criminal History Category II, resulting from his battery on a peace officer conviction. (PSR ¶¶ 64-66.)

For count two, the resulting Guidelines range for an offense level 40 and Criminal History Category II is 324 to 405 months; however, the statutory maximum sentence on count two is 240 months, and thus the Guidelines sentence on that count is 240 months. Therefore, the combined Guidelines sentence on the counts of conviction, counts two and three, is 360 months' imprisonment.

## IV. THE SENTENCING FACTORS SUPPORT A 30-YEAR SENTENCE

### A. The Seriousness of the Offense Warrants a 30-Year Sentence

The seriousness of defendant's crime is captured by the devastation left in its wake. Defendant's senseless murder of Victim A.B. tore apart a community. Victim's A.B. was his mother's "heartbeat since day one" (Ex. A at 1), his partner's co-pilot in life (id., Ex. I at 1), his brother's closest confidante (id., Ex. C at 1), and his sister's loving supporter (id., Ex. D at 1). Victim A.B. was a doting father to his beloved three-year-old son. Even when his son was a baby, Victim A.B. had special traditions with him - they had father/son days where they would get strawberry pancakes together. (Ex. A at 2.) They danced, laughed, played games, and his son would fall asleep holding his dad's ear. (Id.) Instead of watching his son grow, Victim A.B. is frozen as a distant memory for his son, who tries to keep his spirit alive by wishing for his dad at Christmas, decorating their tree with his photos, and laying flowers at his grave on his birthday and holidays. (Id. at 2-3.) He often wishes he had his dad to teach him things, like how to do a backflip. (Id. at 3.) In an instant, defendant and his co-conspirators robbed that little boy and his family of a lifetime of memories with Victim A.B.

Victim A.B. contributed not just to his family, but his community. He opened his home and his refrigerator to persons in need. (Id. at 1.) He helped strangers at the grocery store. (Id.) He proudly graduated high school, then went on to welding school and excelled. (Id.) Before his death, he worked eight- to 12-hour days, six to seven days a week, at Systems Transport as a tanker and dreamed of starting his own trucking company. (Id.) "His face would

light up" when he talked to his mom about these dreams, all of which were cruelly cut short by his murder. (Id.)

Victim J.B. and his family have suffered irreparable harm as well. Victim J.B. and Victim A.B. grew up together and had been friends since fifth grade. (8/27/25 Trial Tr. at 396.) On the night of the robbery homicide, Victim J.B. was shot in both of his hands and the back of his head. (Id. at 401.) He remembers Victim A.B. telling him that he was hit and then their car crashing into a gate, after which Victim J.B. couldn't speak or move. (Id. at 403.) He couldn't help his friend who was dying next to him. He learned of Victim A.B.'s death days later at the hospital after coming out of brain surgery and surgery on both of his hands. (Id.) After years of physical therapy, Victim J.B. still suffers from pain and immobility in his hands, in addition to the grief of losing his close friend and the severe headaches from being shot in the head. (Ex. J at 1.)

Defendant played a vital role in this senseless and selfish crime. He proposed the robbery to his co-conspirators, chose the target, asked his co-conspirator to set up the ruse luring the victims to the scene, told his other co-conspirator they would use a gun if necessary to complete the robbery, and drove the getaway car. Simply put, Victim A.B. would be alive today, if not for defendant Paul. While the government does not seek a role enhancement, defendant Paul's integral part in the plan, preparation, and execution of the robbery homicide supports a 30-year, Guidelines-range sentence. Defendant Paul either knew and intended that co-conspirator Raglin would shoot the victims as part of a gang initiation or he knew that shooting the victims was a distinct

possibility, as he told co-conspirator Raglin before the robbery that they'd use the gun if necessary to successfully rob the victims. Either way, defendant Paul put his immediate desire for weed and money above the permanent devastation of taking a life and grievously wounding another. He prioritized a night of smoking over a lifetime of a young son navigating life without his father.

**B. A 30-Year Sentence Is Necessary to Protect the Public and to Deter Defendant's Further Crimes**

In addition to the senseless crime in this case, defendant has a violent criminal history. He sustained a battery on a peace officer conviction in 2020, during which he squeezed an officer's genitals, attempted to bite an officer, then grabbed an officer's gun holster and tried to pull the holster off his duty belt. (PSR ¶ 64.) During this incident, defendant was armed with an unregistered 9mm semi-automatic firearm that had a threaded barrel. (Id.) And not long after defendant and his co-conspirators robbed and killed Victim A.B. and grievously wounded Victim J.B., defendant was charged with first-degree murder in a case alleging that he shot and killed another person on January 22, 2022. (PSR ¶ 69.) That matter is currently pending in state court. (Id.) Defendant also has a pending armed robbery case alleging – somewhat similar to the present case – that on January 31, 2022, a female co-conspirator lured a victim to a location, after which defendant and another co-conspirator ambushed the victim, robbed him at gunpoint, and threatened "don't even move cause we're gonna shoot you right now." (PSR ¶ 70.) While these charges have not yet been proven, they suggest that defendant's conduct in this case was not aberrant; he was not changed by his participation in the murder of Victim A.B. or the wounding of Victim

J.B. Rather, he continued that pattern of violence, fatally attacking another person, and again using a ruse to lure a victim into another vulnerable situation, then ambushing the person at gunpoint to obtain what he wanted.[2] A meaningful Guidelines sentence is necessary to protect the public against defendant's selfishly fueled violence.

Defendant's lack of remorse for killing Victim A.B. and wounding Victim J.B. also suggests that a Guidelines sentence is necessary to deter defendant from future crimes. While defendant may profess to the Court – nearly five years after the crime and when facing a lengthy sentence – that he feels remorseful and never intended to hurt the victims in this case (see PSR ¶ 33), more telling are his candid actions outside the courtroom. Two weeks after the murder, defendant glorified and immortalized his crimes in an Instagram Story, bragging that he was with the "real shooter" from Treetop Pirus, co-conspirator Raglin, the shooter who killed Victim A.B. and wounded Victim J.B. In the video, defendant gleefully praised the "real shooter," and co-conspirator Raglin made a gun firing gesture in response, enthusiastically accepting this title and his newly minted gang membership. They celebrated their crime and boasted their "toughness" to their Instagram followers, while Victim A.B.'s mother kept the front door open, praying it was all a nightmare and willing her son to walk through it (Ex. A at 3). In the nearly five years since defendant Paul and his co-conspirators killed Victim

---

[2] Defendant Paul's violent behavior appears to have started at a young age. His adoptive mother reported that defendant had a history of setting fires, including setting fire to his grandmother's house, his mother's dumpster, a closet in his mother's home, the blinds in his adoptive mother's house, a dog's fur, and several items in kitchens of homes he trespassed into. (PSR ¶ 115.)

A.B., he has never expressed any remorse. When law enforcement interviewed defendant Paul and asked for his help in solving this crime, he lied about his own participation and opted to abide by "street code" regarding to his co-conspirators. (Dkt. 376 at 5-7; PSR ¶ 32.) Again, he chose self-interest and his own street credibility over the peace he could give to the victims' families. This abject disregard for human life shows that defendant needs a meaningful sentence to protect the public, deter his future crimes, and instill respect for the law and the lives of others.

**C. Defendant's Favorable Plea Accounts for Mitigation and His Acceptance of Responsibility and No Further Downward Variance Is Warranted**

Defendant has endured a difficult upbringing that did not set him up for success. (PSR ¶¶ 75-104). These mitigating circumstances and defendant's acceptance of responsibility, however, is well-accounted for in the plea agreement, and specifically, in allowing defendant to plead to counts two and three only.

Even with a three-level reduction for acceptance of responsibility, defendant's Guidelines range on count two <u>alone</u> is 324 to 405 months. (PSR ¶ 140.) That, coupled with a consecutive mandatory minimum sentence of ten years on count three, makes his total Guidelines range 444 to 525 months' imprisonment. Had defendant pleaded guilty to all counts, he could have been sentenced to up to 480 months on counts one and two (the statutory maximum on each count is 240 months), plus a mandatory minimum consecutive sentence of 10 years on count three. By allowing defendant to plead to counts two and three only, and limiting the government's recommendation to 360 months' imprisonment, the government already

reduced defendant's exposure by between seven years, on the low end, and more than 13 years, on the high end. Defendant's mitigation does not warrant a further departure or variance. His circumstances, albeit very challenging, do not make him any less a danger to the community. Indeed, they underscore the danger defendant poses to himself and others and suggest that defendant should seek out counseling and drug dependency programs in custody.

## V. DEFENDANT SHOULD BE ORDERED TO PAY RESTITUTION

Restitution is mandatory in this case, regardless of defendant's ability to pay. (PSR ¶ 28; 18 U.S.C. § 3663A.) Defendant acknowledged in the plea agreement that he would be held jointly and severally liable for restitution, which was estimated at $1,969,675.87. (PSR ¶ 8.)

As set forth in Exhibits J and K, the families of both victims have incurred recoverable expenses resulting from defendant's crimes. Victim A.B.'s mother incurred funeral and memorial expenses, lost wages for her son, and mileage and parking expenses to attend court proceedings, totaling $1,958,113.37. (Ex. J.) Victim J.B.'s family incurred mileage expenses taking their son to and from physical therapy, and mileage and parking expenses to attend court proceedings, totaling $1,562.50. (Ex. K.) The total combined restitution amount is $1,959,675.87.

Defendant should be ordered to pay restitution and should be held jointly and severally liable with his co-conspirators for the full amount.

## VI. CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court sentence defendant to 30 years' imprisonment,

consisting of 20 years on count two and 10 years on count three; three years of supervised release on count two and five years of supervised release on count three, to be served concurrently; and order defendant to pay a special assessment of $200 and mandatory restitution in the amount of $1,959,675.87, for which he is jointly and severally liable with his co-conspirators.

Dated: January 23, 2025

Respectfully submitted,

TODD BLANCHE
Deputy Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney

ALEXANDER B. SCHWAB
Assistant United States Attorney
Acting Chief, Criminal Division

/s/
CHELSEA NORELL
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA