# EXHIBIT J

CHERNIS LAW GROUP P.C.
Michael S. Chernis, CSB 259319
401 Wilshire Blvd, 12th Floor
Santa Monica, CA 90401
Tel: (310) 566-4388
Fax: (310) 382-2541
michael@chernislaw.com

Attorney for Defendant
**MATEO PAUL**

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>vs.<br><br>MATEO PAUL<br><br>Defendant. | Case No.: 2:23-cr-00116-FLA-1<br><br>*[The Honorable Fernando L. Aenlle-Rocha]*<br><br>**DECLARATION OF JACK DONSON IN SUPPORT OF DEFENDANT MATEO PAUL'S SENTENCING POSITION** |

**DECLARATION OF JACK DONSON IN SUPPORT OF DEFENDANT MATEO PAUL'S SENTENCING POSITION**

I, Jack Donson, hereby declare under penalty of perjury that the following is true and correct.

1. I submit this Declaration at the request of counsel for Mateo Paul to provide information relevant to his sentencing and have been retained by counsel for Mr. Paul through CJA for these purposes.

**STATEMENT OF EXPERTISE**

2. I am the Founder of My Federal Prison Consultant, which I started after retiring from the Federal Bureau of Prisons ("BOP") where I worked for 23 years. I now provide consulting, training, and expert witness testimony on federal prison issues. Between my work for the BOP and my private consulting work afterwards, for over 37 years I have worked directly with federal offenders and have testified in district courts throughout the country on BOP incarceration issues. I am also the executive director of a non-profit organization called the Federal Prison Education and Reform Alliance, which provides training, education and support to the federal justice community concerning BOP policy and process.

3. During my 23 years of employment by the BOP, I worked directly with inmates on security classification, correctional programs and treatment issues. I also worked with inmates and trained staff as a "Correctional Treatment Specialist" (i.e., case manager & case management coordinator). Since retiring from the BOP, I have remained current on these issues by actively following policy initiatives and routinely attending training conferences, including the U.S. Sentencing Commission conference, which includes a presentation by BOP staff on current prison issues. I have authored articles and book chapters on federal prison matters in national print media, legal periodicals and ABA publications.

4. While with the BOP, I also completed hundreds of training courses, including basic and advanced case management training and leadership-related courses. I had full-time

collateral administrative responsibilities, including training case management staff, mentoring, local policy writing, conducting facility audits, and overseeing institutional programs. I have worked in minimum (camp), low, medium, administrative (pre-trial and high security), and Witness Security (PCU) units. On several occasions, I was assigned to the BOP Philadelphia Regional Office (NERO) and the New York City Community Corrections Office. I have expertise with U.S. Parole Commission policy and process and BOP sentence computations.

5. My skillset is unique, policy-focused, and has been molded by my regular interaction with BOP staff and administrators as well as inmates in the trenches of the federal prison system. This interaction has continued during my retirement through daily contacts with attorneys, non-governmental organizations, and email correspondence with incarcerated people from around the prison system. In my role as the National Director for Inmate Programs and Services for FedCURE, which is a non-profit that advocates for inmates, I regularly interacted with BOP central office staff regarding prison issues, and I was solicited for feedback on legislation such as the First Step Act. I have conducted First Step Act-related training for the NACDL, AOUSC and federal defender organizations. I was recently invited to attend meetings with the GAO regarding the First Step Act and the DOJ for the Access to Justice initiative related to BOP legal communication.

6. As such, I have expertise on a broad range of issues pertaining to BOP policy, BOP security classifications and security challenges at various types of facilities, treatment capabilities, programming available to inmates at various types of institutions and the unique challenges BOP faces in meeting treatment and rehabilitation objectives. I have been qualified as an expert witness in accordance with Federal Rule 702 (Daubert Standards) and have never been denied the ability to testify as an expert witness on BOP-related issues.

7. I also hold a bachelor's degree in Sociology/Anthropology and a Master of Science Degree in Criminal Justice. Aside from consulting, I was a Lecturer at Marywood University for several years, and taught Criminal Justice courses, including one entitled

The American Prison. A true and correct copy of my *Curriculum Vitae* is attached as Exhibit 1.

8. I have personal knowledge of the facts stated herein and can testify competently thereto if called as a witness in this matter.

**SCOPE OF REVIEW**

9. I have received from Mr. Paul's counsel the Presentence Report ("PSR"), the neurological and psychological evaluation and assessment reports prepared by Dr. Safi and Dr. Phillips, the Plea Agreement, and the Indictment. I have been asked to estimate Mr. Paul's security classification and provide the Court with an opinion regarding a facility designation that best accommodates his program needs for rehabilitation, his safety while in custody, and treatment objectives, given Mr. Paul's relative youth and history of mental illness. I offer my opinion from a BOP correctional treatment perspective, having worked directly with federal inmates for nearly four decades.

**SUMMARY OF FINDINGS**

10. Mr. Paul will be extremely vulnerable in a high security USP facility and will be subject to predation given his age, lack of prior prison experience, and mental health deficits. To better manage this liability, it is recommended that the Court make a specific recommendation at sentencing to support designation at a medium security facility and for specific program participation to better meet his rehabilitation, treatment, and safety needs. The court should also be aware that the BOP may consider Mr. Paul to be in primary-state custody, so his time on writ in federal custody will not be credited towards the federal sentence absent further order of the Court at the very least applying a variance to ensure Mr. Paul receives credit against his federal sentence for time spent in pre-trial federal custody which might otherwise be "dead time.".

**SECURITY CLASSIFICATION (BRAVO) AND "MANAGEMENT VARIABLES"**

11. The BOP classifies facilities into several categories including minimum security (camp), low and medium security (FCI's), high security (USP) and administrative facilities

(MCC/MDC/FDC & Medical Centers). The inmate classification tool used by BOP is known as "BRAVO" (Bureau Risk Assessment Verification and Observation).

12. Some of the factors used in BOP classification are age, criminal history points, history of violence and/or escape, and characteristics of the instant offense. Each factor has a corresponding point value, which is totaled to determine an overall security level and facility placement. Below is a chart based on the BOP classification manual (CPD/CPB, Number P5100.08, Inmate Security Designation and Custody Classification).[1]

| Security Level | Male | Female |
|---|---|---|
| MINIMUM | 0-11 Points | 0-15 Points |
| LOW | 12-15 Points | 16-30 Points |
| MEDIUM | 16-23 Points | N/A |
| HIGH | 24 + Points | 31 + Points |

13. Security points alone do not determine the level as BOP policy includes other "*public safety factors*" (PSFs) that can elevate a security classification despite the security score. Mr. Paul will have at least one PSF due to the instant offense being of the greatest severity, and it is likely he will have an additional PSF based on the length of the sentence. I have estimated that, based on his score and PSFs, Mr. Paul will be classified" as "high security (34 points), meaning placement in a USP.

14. Notably, the classification policy contemplates what are referred to as "*management variables*" that give BOP the discretion to designate offenders to a facility below their scored security level for various penological purposes. For example, the BOP has the discretion to assign a "*lesser security*" management variable given his age and vulnerability in a U.S. penitentiary environment. For the reasons discussed below, I strongly urge the

[1] https://www.bop.gov/policy/progstat/5100_008cn.pdf

Court to recommend such a "management variable" for Mr. Paul. While it will not reduce his sentence, it will increase his safety, treatment, and rehabilitation.

## U.S. PENITENTIARY ENVIRONMENT and YOUTHFUL OFFENDERS

15. A U.S. penitentiary designation will, in my judgment, be extremely problematic for Mr. Paul and contrary to rehabilitative objectives, given his young age, mental health history, and lack of federal prison experience.

16. U.S. Penitentiaries are violent, predatory environments that are gang-centric and difficult to navigate, especially for young adults. Even young adults with a history of gang affiliation outside of prison are vulnerable and subject to such predatory practices.

17. The youth issue is probably the most concerning aspect of this case. I have personally witnessed youthful offenders engage in fights, commit assaults, and move contraband just to gain favor with the older population, believing that giving in to the pressure would lead to less exploitation. The end result becomes the loss of good time for violating institution rules and extended placement in the special housing unit (SHU/Solitary confinement) which is extremely problematic for people with mental health issues. Exploitation by more "hard-core" gang members is also counter-productive in terms of a young inmate's safety and treatment objectives.

18. At USP facilities, young inmates like Mr. Paul are also routinely pressured into sexual exploitation especially if they are smaller in stature or where there is a prior history of sexual abuse. In 2003, The Prison Rape Elimination Act ("PREA") was passed to stop the pervasive sexual abuse in correctional facilities by adopting a "zero tolerance" policy. The sexual exploitation issue in this case is concerning due the administrations recent defunding of the National PREA Resource Center. [2]

19. An unfortunate reality in the federal prison system is that when new inmates arrive, they are almost immediately approached by other inmates to "*show their papers*" in a sub-cultural vetting process. This process is done to identify cooperators (aka: "*rats*") and sex

[2] https://jailtraining.org/defunding-prc-what-it-means-for-correctional-facilities/

offenders (aka: "*chomos*"). When inmates are unable to produce court documents, other inmates will go as far as conducting Google and PACER searches to determine the crime and look for irregularities in docket entries, case information, etc. This process is more regimented and intense in penitentiaries where gang members are assigned the specific task of checking other inmates' cases. Inmates with tattoos are also stripped down by the other inmates to identify prior gang affiliation. These inmate subcultural vetting activities are intimidating for inmates without significant prison experiences.

20. As someone who reported association with a local Blood gang sect in the past, Mr. Paul will likely be sought out by the Bloods and be pressured to become active in their gang activities, even though there does not appear to be any allegation that the underlying offense conduct was gang-related. Failing to associate with the Bloods will not only put him at risk from the Bloods but from rival gang members. Thus, to the extent Mr. Paul wishes to disassociate from gang activities, he will face serious consequences at a USP for not engaging in activities on behalf of a blood gang

**MENTAL HEALTH CLASSIFICATION and TREATMENT**

21. Based on my review of the PSR and discussions with counsel, it appears that Mr. Paul has been diagnosed as having mental illness, including bipolar disorder, mood disorder and depression, and has been prescribed several psychotropic medications. In addition, I understand that intensive psychotherapy has been recommended as well as substance abuse treatment while in custody.

22. From a medical/clinical classification perspective, all inmates are assigned a provisional medical classification for both physical and mental health during the designation process. It is a four-level system referred to as "*Care Levels*"[3] which are explained in the February 18, 2025 BOP memo on Treatment and Care of Inmates with Mental Illness and May 2019 BOP Clinical Guidance on Care Level Classification For Medical and Mental Health Conditions or Disabilities, as summarized below:[4]

[3] https://www.bop.gov/policy/progstat/5310_016_cn-1.pdf
[4] https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf

(1) CARE1-MH: No Significant Mental Health Care. An individual is considered to meet CARE1-MH criteria if he/she:

- Shows no significant level of functional impairment associated with a mental illness and demonstrates no need for regular mental health interventions; and
- Has no history of serious functional impairment due to mental illness or if a history of mental illness is present, the inmate has consistently demonstrated appropriate help-seeking behavior in response to any reemergence of symptoms.

(2) CARE2-MH: Routine Outpatient Mental Health Care or Crisis-Oriented Mental Health Care. An individual is considered to meet CARE2-MH criteria if he/she has a mental illness requiring:

- Routine outpatient mental health care on an ongoing basis; and/or
- Brief, crisis-oriented mental health care of significant intensity; e.g., placement on suicide watch or behavioral observation status.

(3) CARE3-MH: Enhanced Outpatient Mental Health Care or Residential Mental Health Care. An individual is considered to meet the criteria for CARE3-MH if he/she has a mental illness requiring:

- Enhanced outpatient mental health care (i.e., weekly mental health interventions); or
- Residential mental health care (i.e., placement in a residential Psychology Treatment Program).

(4) CARE4-MH: Inpatient Psychiatric Care. A mentally ill inmate may meet the criteria for CARE4-MH and require acute care in a psychiatric hospital if the inmate is gravely disabled and cannot function in general population in a CARE3-MH environment.

Despite Mr. Paul's extensive history of mental health issues, including psychiatric interventions and medication and diagnoses for mental illness and various disorders, it is highly unlikely that Mr. Paul will merit designation to a federal medical center; rather he will likely be designated in CARE2-MH (or perhaps CARE3-MH depending on his state

of mind and quality of mental health at the time of BOP placement) and thus housed in the general population in a mainstream federal facility. The BOP is simply not staffed with resources needed to provide individual psychotherapy unless a person's mental health care level is elevated due to a crisis or severe mental illness. The BOP does not have the clinical resources to conduct even weekly individual counseling unless there is an elevated care level. The BOP is simply not staffed for frequent individual clinical services unless the inmate has a crisis such as hypo-manic episode or suicide attempts and/or ideation.

23. It is well known within the federal justice community that the BOP is experiencing staff shortages and frequently locks down its higher-level facilities. This inhibits the delivery of programs and services and happens more in penitentiaries than in medium security facilities, where security is paramount to treatment.

24. Health care and staffing have always been a significant concern in the BOP system, even before the pandemic when it was described by a former BOP central office medical director as being at *"crisis"* levels.[5] Since the pandemic, BOP healthcare continues to be under the scrutiny of advocates, the DOJ inspector general and the courts. As recently as October 2022, U.S. District Judge Roy B. Dalton issued a court order saying the BOP "*should be deeply ashamed*" for what he called "*its demonstrated contempt for the safety and dignity of the human lives in its care*."[6] After Judge Dalton held the agency in contempt, the DOJ launched an internal investigation of the BOP.

25. More recently, the DOJ released a disturbing report on inmate deaths in BOP facilities. In reviewing 344 deaths, over one-half were suicide and the IG found inappropriate mental health care levels assignments for inmates who later died by suicide. It also found that some institution staff failed to coordinate efforts across departments to provide necessary treatment or follow-up with inmates in distress.[7] This report was referenced by both IG Horowitz and former Director Peters who both pointed to staffing shortages as a key driver

---

[5] https://oig.justice.gov/reports/2016/e1602.pdf

[6] Devlin Barrett, Judge blasts Bureau of Prisons' treatment of dying prisoner, *Washington Post*, Oct. 14, 2022, https://www.washingtonpost.com/national-security/2022/10/14/prisons-contempt-dying-inmate/.

[7] https://oig.justice.gov/news/doj-oig-releases-report-issues-surrounding-inmate-deaths-federal-bureau-prisons-institutions

of the problems. A lack of clinical staff like psychologists and corrections officers has been an endemic challenge in many BOP facilities. [8]

26. A DOJ reported on the Devens Federal Medical Center posted as recently as December of 2024 cited significant staff shortages which included a 39% vacancy in the psychology services department This unannounced inspection referred to widespread and troubling operational challenges that substantially affected the health, welfare and safety of staff and inmates which was particularly "problematic " based on its mission as a medical facility. [9]

27. This staffing and medical treatment limitations are another reason why a USP is not the best setting for Mr. Paul in terms of meeting his very serious treatment needs.

## CORRECTIONAL TREATMENT PROGRAMS[10]

The August 2025, First Step Act Approved Programs Guide contains programs that are seemingly available to address Mr. Paul's correctional treatment needs. These more intensive BOP programs are delivered in residential unit settings referred to as therapeutic communities.

28. Based on the information in the documents reviewed, it is my opinion that Mr. Paul would be appropriate for the following programs:

29. **BRAVE**: This program is delivered in a medium security facility , not a USP, and described in BOP literature as follows:

*"The Bureau Rehabilitation and Values Enhancement (BRAVE) program is a cognitive behavioral, residential treatment program for younger, initial designated adults in custody (AIC). Offenders typically participate in this program at the beginning of their sentence. Programming is delivered within a modified therapeutic community (MTC). Participants interact in groups and attend community meetings while living in a housing unit separate from the general population. The BRAVE program is designed to facilitate favorable*

[8] https://www.themarshallproject.org/2024/03/02/senate-federal-prison-senate-deaths#:~:text=The%20inspector%20general's%20report%20also%20found%20that,underdiagnosed%2C%20a%20previous%20Marshall%20Project%20investigation%20found

[9] https://oig.justice.gov/news/doj-oig-releases-inspection-bops-federal-medical-center-devens

[10] It should be noted that even if Mr. Paul completed the Residential Drug Abuse Treatment Program, he is not eligible for early release under 3621 (e) due to a crime of violence. He also is not eligible for any extra time credits under the First Step Act.

*institutional adjustment and reduce incidents of misconduct. Program content focuses on developing interpersonal skills, behaving pro-socially in a prison environment, challenging antisocial attitudes and criminality, drug education, developing problem solving skills, success strategies and planning for release. The AIC must meet the following: AIC is 40 years of age or younger; AIC has a sentence of at least 36 months remaining to serve; AIC is a first time Bureau commitment; and AIC is within the first 18-months of his sentence."* (*See* Exhibit 2)

30. Because the BRAVE program is only offered in medium security facilities it would require the court to recommend a "lesser security" management variable to facilitate placement. The BOP has the discretion to place offenders below their scored security level for various purposes including program participation. In fact, the classification manual points to age as a factor when considering this application. Specifically, chapter 5 of the above-refenced classification manual references age within the definition of the lesser security variable as follows:

*"Lesser Security. There may be security concerns which are not adequately reflected in the classification scheme. In circumstances where an inmate represents a lesser security risk (i.e., detainer removed, positive adjustment, etc.) than the assigned security level, the inmate may be placed in an institution outside normal guidelines.* ***For example, where age is largely the contributing factor in the inmate's placement, this Management Variable will apply.****"* (Emphasis added)

31. **SKILLS:** This is a program offered at only one medium security prison in Florida, and is geared towards inmates with extremely limited IQ and learning deficits. It could be a good alternative to the BRAVE program if for whatever reason BOP deems it appropriate.

*"The Skills Program is a unit-based, residential treatment program designed to improve the institutional adjustment of those who have intellectual and social impairments. Individuals with lower IQs, neurological deficits from acquired brain damage, fetal alcohol syndrome, autism spectrum disorder, and/or remarkable social skills deficits are more likely to be victimized and/or manipulated by those more sophisticated. As a result,*

*they may be placed in the Special Housing Unit for their protection or may have frequent misconduct reports because of their limited decision-making skills. Only those who have a demonstrated need for the Skills Program and who are appropriate for housing in a medium or low security facility will be considered for participation. Through using a modified therapeutic community (MTC), the Skills Program employs a multi disciplinary treatment approach aimed at teaching participants basic educational and social skills. The goal of the program is to increase the academic achievement and adaptive behavior of this group of individuals, thereby improving their institutional adjustment and likelihood for successful community reentry. Some participants may become Mental Health Companions; these individuals are carefully screened and serve as supports and role models for Skills Program participants."*

32. **CHALLENGE**: This program is delivered in a high security (USP) and would be the second best option for Mr. Paul should the Court not recommend or the BOP not grant the "Management Variable." This program is described in BOP literature as follows:

*"The Challenge Program is a cognitive behavioral, residential treatment program developed for male offenders in the United States Penitentiary (USP) settings. The Challenge Program provides treatment to high-security offenders with substance use problems and/or mental illnesses. Programming is delivered within a modified therapeutic community (MTC); individuals participate in interactive groups and attend community meetings while living in a housing unit separate from the general population. In addition to treating substance use disorders and mental illnesses, the program addresses criminality, via cognitive behavioral challenges to criminal thinking errors."* (*See* Exhibit 3)

33. The CHALLENGE PROGRAM would be the best option for Mr. Paul short of being placed in a medium security facility and in my opinion the only program in a USP where Mr. Paul would have a chance. The problem is that aside from living in the program unit, inmates still interact with the regular USP units daily and on weekends, so those same USP threats are there because of his age.

34. Mr. Paul would also benefit from a vocational training program such as the Department of Labor's Heating Ventilation and Air Conditioning (HVAC) Program and work in Federal Prison Industries (FPI) referred to as UNICOR. These options are often available in conjunction with either the CHALLENGE or BRAVE programs.

**NO FEDERAL CREDIT FOR PRE-TRIAL DETENTION ABSENT COURT ORDER**

35. It is my understanding that Mr. Paul was writted into federal custody on November 13, 2023, and remained in federal detention until approximately May 20, 2024, at which time he was transferred back into the custody of Orange County to face separate state charges. It is also my understanding that Mr. Paul was brought back to federal custody in February 2024 and remains in federal custody pending the sentencing in this matter. Thus, by my estimation, Mr. Paul will have spent approximately 18 months in federal custody by the time he is sentenced, for which he would normally receive credit against his federal sentence were there no pending state charges.

36. Because the State of California appears to have "primary custody" over Mr. Paul given the pendency of a state case against him and his placement in Orange County custody prior to the initiation of the underlying federal prosecution, and because the underlying federal case does not appear to be "Relevant Conduct" to the state case, BOP will not credit Mr. Paul for any of the 18 or more months spent in federal detention absent an order from the Court pursuant to USSG 5G1.3 that the sentences be served in whole or in part concurrently, or at the very least from the Court specifically ordering at sentencing a variance to account for this otherwise uncredited federal time. For example, the Court may order as follows, assuming a sentence of 240 months as a hypothetical and 18 months of accrued federal custody credit:

***"Pursuant to U.S.S.G. § 5G1.3(d), the imposed term is 226 months, adjusted from 240 months, to account for defendant's confinement from [Date 1] to [Date 2], and from [Date 3] to [Date 4] in relation to Orange County Superior Court Case No. 22CF0249, that would not otherwise be credited by the Bureau of Prisons."***

37. In addition, because Mr. Paul is going to be returned to state custody after his sentencing, BOP will not begin to credit his time against his federal sentence unless the Court expressly orders in the Judgement and Commitment Order that the "Sentence to begin Immediately," pursuant to BOP Program Statement No. 5160.05.

## CONCLUSION

38. Mr. Paul faces significant challenges in any penal setting given his age, mental health, and lack of prior prison experience. While the BOP has general controls in place to protect vulnerable offenders, there is the heightened potential for predation and/or the repeated cycle of protective custody, isolation, transfer, then repeat. Any prison term imposed will likely feel more punitive than the average offender, given his deficits. Rehabilitation will also be difficult given the current state of the BOP. Therefore, it is recommended that the court provide a more targeted judicial recommendation for his designation for the safest environment based on his classification and treatment needs. The BOP attempts to accommodate judicial recommendations and has historically tracked compliance at over 70 percent.

39. Such language for a specific recommendation would be: "*The court recommends the BRAVE or SKILLS programs and does not object to the assignment of a lesser security management variable to facilitate this recommendation, given the defendant's age, mental health history, and lack of penitentiary experience. If the BOP determines a high security facility is necessary, the Challenge Program at USP Coleman II is recommended.* The court also recommends the Federal Prison Industries work program (aka: FPI-UNICOR)

Executed in Dingmans Ferry, PA, on this 18th day of December___ 2025

Jack T. Donson

# Exhibit 1




Jack Thomas Donson
Email: jack@bopera.org
Telephone (212) 461-2252 B.
(570) 687 6829 C. (Preferred)

**Personal Information**

Education: BS-Sociology/Anthropology,
MS-Criminal Justice

**Personal Statement**

I have worked directly with incarcerated people for over 38 years at the county, state and federal levels. I educate and support the federal justice community on BOP policy and process to obtain better outcomes in representation, advocacy and legislation. In 2011, I retired from the BOP and founded "*My Federal Prison Consultant*", LLC, after witnessing decades of exploitation of incarcerated people and families by high priced and uninformed prison consultants. This exploitation has exacerbated under the First Step Act because the lack of BOP transparency and accountability fosters exploitation.

Most of my career, I managed caseloads within the trenches of the prison system as a Correctional Treatment Specialist. I also served in administrative capacities (CMC/Unit Manager/Camp Administrator). I have conducted facility audits, participated in policy writing work groups, oversaw programs and trained case managers in classification and correctional programs. My perspective is unique and derived from directly applying policy in various prison environments including Pre-trial ( administrative/high security), Minimum, Low, Medium, & Witness Security units. I received three national awards during my career and over thirty other performance awards.

After twelve years in the private sector working with families and justice professionals, I saw a profound need for a more educated justice community regarding BOP issues. I recently formed The Federal Prison Education and Reform Alliance (501C3) and serve as the Executive Director. The organization intends to be the primary stakeholder focused solely on BOP issues while also supporting people in prison. Our organization has already conducted training around the country for Federal Defenders, Judges and the Administrative Office of the US Courts.

I have served pro bono for several non-profit organizations helping marginalized populations and their families navigate the prison system. (FedCURE/Out4Good/Choosing Integrity) I am a member of the Corrections Committees of the National Association of Criminal Defense

Lawyers (NACDL) and the American Bar Association (ABA). I have testified in federal district courts throughout the United States and the United Kingdom. I was a lecturer at the university level and have taught several courses including one entitled "The American Prison."

My most rewarding government contract work as an expert is supporting post-conviction petitions by submitting formal declarations and testifying for juvenile and young adult lifers sentenced in the D.C. Superior Court regarding the Incarceration Reduction Amendment Act (IRAA) and Second Look Act.

My passion is federal prison reform, and my mantra is that many proactive reforms can be accomplished under the existing policy and statutory framework through leadership, accountability and transparency. I have a pulse on the agency from working on both sides of the system and my knowledge of BOP policy, process and culture is extraordinary. My analytical ability in combination with my practical experience provides me with insights which is advantageous for clients, attorneys, legislators, the media and reform organizations. I have appeared on several national television and radio programs as a commentator and have been quoted in national print media. I have authored chapters in two ABA Books on mental health issues and articles in the Federal Sentencing Reporter, The Hill as a "Opinion Contributor" and Bloomberg Law Insights as an "Outside Editor."

**Current Work Experience**

***The Federal Prison Education and Reform Alliance-*** Executive Director -Non-profit providing education and support to the federal justice community and direct services to the incarcerated. July 26, 2023-Present www.bopera.org

***My Federal Prison Consultant**, LLC-* President& Founder, supports counsel, clients and families on both technical policy issues and general prison support on all areas of the BOP. I testify around the country on BOP issues relevant to mitigation. July 2011-Present www.mfpcllc.com

**Prior Work Experience**

***Prisonology***, VP- Operations & Co-founder, Consulted, testified and developed CLE's which were delivered to federal defenders, judges and CJA panel attorneys. September 2014- Feb. 2022.

***FedCURE***, Director of Programs and Case Management Services, Assist the incarcerated and their families relative to federal prison issues, pro bono via a designated BOP liaison in the central office. July 2011- June 30, 2023. www.fedcure.org (volunteer)

***Out4Good,** LTD,* Executive Director- In charge of developing the "Correcting Corrections in America initiative", April 2013 to April 1, 2024. Stepped down to a regular board member position to focus on PERA. www.out4good.org

***Marywood University**,* Lecturer PA- Criminal Justice Professor- courses entitled: "Community Corrections," "Shadow and Service" and "The American Prison." January 2013-January 2019

***Federal Bureau of Prisons***, Correctional Treatment Specialist & Case Mgt. Coordinator- I was responsible for the counseling, classification, inmate discipline and re-entry. I coordinated institution programs and trained staff in classification & correctional programs.

- Special expertise working with high profile organized crime figures, the Witness Protection (WITSEC) program & white-collar crime offenders.
- Alternate Case Management Coordinator 1991 to 2011
- Assignments (TDY) in the Regional Office, Philadelphia, PA. (CIM Coordinator/Correctional Programs), New York City Community Corrections Office (processing designations and halfway house referrals) & several National (DC) policy writing work groups.
- Annual Training Instructor in the areas of security designation/classification, Central Inmate Monitoring (CIM,), FOIA/Privacy Act & Victim Witness program.
- Member of Hostage Negotiation Team
- Received 3 National Awards for Excellence in Administration & Detention Procedures, National Correctional Treatment Specialist of the Year & Excellence in Training Award.
- Taught Institution familiarization orientation to new staff & was assigned as a mentor for college interns and newly appointed case managers and counselors.
- Held assignments as Camp Administrator, Case Management Coordinator, Unit Manager and Assistant Case Management Coordinator.
- Liaison for US Parole Commission, US Marshals, FBI and ICE
- Worked in minimum, low, medium, administrative (including high security) & Witness Security (WITSEC) units.

***Commonwealth of Pennsylvania,*** Probation and Parole Officer- Supervised a caseload of adults and juveniles. Appeared in court on a weekly basis, prepared pre-sentence reports, submitted parole recommendations to the court, provided community supervision of offenders and managed the work release and ARD programs. ( Internship with Scranton District Office of the PA Board of Probation and Parole).

**Army National Guard,** (E-5) Easton, PA 1986-1995

- **Military Police** (MP-95 Bravo), Ft. McClellan, AL
- **Stinger Missile Gunner** (16 Sierra), Ft. Gordon, Ga.

**Education**

Marywood University, Scranton, Pennsylvania

- **Master of Science in Criminal Justice** 1997 (Concentration in Public Administration)

East Stroudsburg University, East Stroudsburg, Pennsylvania

- **Bachelor's Degree in Sociology/Anthropology** 1985

**Awards**

- 1998 National Community Corrections Award

- 1990 National Correctional Treatment Specialist of the Year
- 1991 National Excellence in Annual Training Award
- I received thirty-two other monetary personal achievement awards.

**Other Activities/memberships**

***Choosing Integrity***, Board Member (2018-2025) https://www.choosingintegrity.org/about/

- Testified on Capitol Hill to the Colson Task Force on Federal Corrections
- AOUSC Trainer -Defender Investigator and Paralegal Seminar-Houston TX
  Winning Strategies Seminar-BOP Mental Health-Austin, TX
- Authored Article on BOP Restrictive Housing in the Federal Sentencing Reporter
- Authored Chapter's in ABA Publications on Autism Spectrum Disorders (2019) & Suicide and Its Impact on the Criminal Justice System (2021)
- Regularly provides training on federal prison issues to federal defenders, Judges & for the AOUSC
- Numerous National media outlet appearances for commentary (CNBN/Fox/CNN)
- NACDL Corrections Committee since 2011
- ABA Corrections Committee 2012- Chaired Standing sub-committee on BOP Policy
- Monthly contributor to the Sentencing Partners Newsletter from Joaquin & Duncan
- Finance Committee Chair-United Methodist Church
- Authored OP Eds in The Hill regarding BOP issues
- Member of the U.S. Ombudsman Association (USOA)
- Member of the PA Prison Society
- Overall offender advocacy & general federal prison & legislative reform efforts
- Hiking, Fishing, Leisure Travel

## References, testimonials and award letters are available upon request.

# Exhibit 2

# BRAVE (RESIDENTIAL)

## DESCRIPTION

The Bureau Rehabilitation and Values Enhancement (BRAVE) program is a cognitive behavioral, residential treatment program for younger, initial designated adults in custody (AIC). Offenders typically participate in this program at the beginning of their sentence. Programming is delivered within a modified therapeutic community (MTC). Participants interact in groups and attend community meetings while living in a housing unit separate from the general population. The BRAVE program is designed to facilitate favorable institutional adjustment and reduce incidents of misconduct. In addition, the program encourages participants to positively interact with team members and take advantage of opportunities to engage in self-improvement activities throughout their incarceration. Program content focuses on developing interpersonal skills, behaving pro-socially in a prison environment, challenging antisocial attitudes and criminality, drug education, developing problem solving skills, success strategies and planning for release.

The protocol is delivered in a group/community format with tracked/documented sessions. Program length is typically completed over 6 months of half-day, face-to-face contact between treatment team members and participants. As of November 1, 2021, expanded eligibility criteria of the BRAVE program became effective. The purpose of this expansion beyond the original target population reference in policy for BRAVE programs (PS5330.11) was to allow for an increase in the offering of appropriate programming to many more AICs and to help meet the purpose of the First Step Act and mission of the Bureau of Prisons. The AIC must meet the following: AIC is 40 years of age or younger; AIC has a sentence of at least 36 months remaining to serve; AIC is a first time Bureau commitment; and AIC is within the first 18-months of his sentence.

## CREDITED HOURS

350

## LOCATIONS

| | | |
|---|---|---|
| FCI Beckley (M) | FCC Victorville (M) | FCI Greenville (M) |
| FCI EL Reno (M) | FCI Williamsburg (M) | |

Key: (L) = Low; (M) = Medium; (H)= High

## NEEDS

Will change the antisocial peers and cognitions need from YES to NO.

## RISK

Will decrease risk points for the category program completions.

## AUTHORIZED FACILITATORS

To ensure program fidelity and proper credit, BRAVE must be delivered by Psychology Services. Please refer to **PS 5330.11, Psychology Treatment Programs**, for further guidance.

# Exhibit 3

# CHALLENGE (RESIDENTIAL)

## DESCRIPTION

The Challenge Program is a cognitive behavioral, residential treatment program developed for male offenders in the United States Penitentiary (USP) settings. The Challenge Program provides treatment to high-security offenders with substance use problems and/or mental illnesses. Programming is delivered within a modified therapeutic community (MTC). Participants interact in groups and attend community meetings while living in a housing unit separate from general population. The Challenge Program is designed to facilitate both favorable institutional adjustment and successful reintegration to the community via treatment of substance use disorders and/or treatment/management of mental illnesses. Program content focuses on developing interpersonal skills, behaving pro-socially in a prison environment, challenging antisocial attitudes and criminality, improving communication skills, developing problem solving skills, violence prevention, recovery maintenance, success strategies, and planning for release.

The Challenge Program is available in 11 high security institutions. Offenders interested in this program may participate at any point during their sentence; however, they must have at least 18-months remaining on their sentence. The duration of the program varies based on personal need. An offender must meet one of the following criteria to be admitted into the Challenge Program: A history of drug use as evidenced by self-report, Presentence Investigation Report (PSI) documentation or incident reports for use of alcohol or drugs; A serious mental illness as evidenced by a current diagnosis of a psychotic disorder, mood disorder, anxiety disorder, or severe personality disorder.

## CREDITED HOURS

500

## LOCATIONS

| | | | |
|---|---|---|---|
| USP Atwater | USP Beaumont | USP Big Sandy | USP Lee |
| USP Canaan | USP Coleman I & II | USP Hazelton | USP Tucson |
| USP McCreary | USP Pollock | | |

## NEEDS

Will change the anger/hostility, antisocial peers, cognitions, and substance use need from YES to NO.

Will address but not change the mental health need.

## RISK

Will decrease risk points for the program completions category.

## AUTHORIZED FACILITATORS

To ensure program fidelity and proper credit, the Challenge Program must be delivered by Psychology Services. Please refer to **PS 5330.11, Psychology Treatment Programs**, for further guidance.